**Arthur CLARK; Melissa Clark, Plaintiffs–Appellees,**

**v.**

**Earl LINK; R.E. Combs, Defendants–Appellants,**

**and**

**Charles Britt; Fredrickia Britt; Frank Stanley, Defendants.**

**No. 87–2155.**

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1988.

Decided Aug. 16, 1988.

Nancy R. Hatch (Richard T. Rice, Womble, Carlyle, Sandridge & Rice, Winston–Salem, N.C., on brief), for defendants-appellants.

Lacy H. Thornburg, Atty. Gen., Joan Herre Byers, Sp. Deputy Atty. Gen., Dept. of Justice, Raleigh, N.C., on brief for amicus curiae.

George Daly, for plaintiffs-appellees.

Before RUSSELL and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This section 1983, 42 U.S.C. conspiracy action was begun by the plaintiffs against certain private individuals and two county deputy sheriffs. The two officers filed a defense denying participation in any conspiracy to violate plaintiffs' constitutional rights and pleading specially qualified immunity. The district judge heard the qualified immunity defense and the claim of insufficiency of evidence of an actionable conspiracy on a motion for summary judgment by the two officer defendants. The motion was denied on both grounds and the officer defendants have appealed. We reverse.

I.

The suit herein arose out of a contest over the custody of an infant, at the time fifteen months of age, between the family of an aunt (the defendants Fredrickia Britt and her husband Charles Britt) and the family of a paternal first cousin (the plaintiff Melissa Clark and her husband Arthur Clark) of the infant. The mother of the infant had been killed by the infant's father and the infant has been committed to the custody and control of the Department of Social Services in Columbus County (North Carolina), the residence of the parents at the time of the unfortunate tragedy. The ultimate custody proceedings were within the jurisdiction of the District Court of

Columbus County, over which Judge William C. Gore, Jr. presided. For purposes of this appeal it is unnecessary to review the proceedings before Judge Gore leading up to the entry of an order by Judge Gore granting custody to the Britts. At the time the infant was with the Clarks. When the Britts sought delivery of the infant by the Clarks pursuant to the order of Judge Gore, they were told the infant had been taken to Georgia and would not return until some days later. The Britts at that point swore out a warrant for the Clarks before the magistrate in Columbus County. This warrant charged the Clarks with the violation of N.C.G.S. § 14–320.1, which makes it a crime for any person, in violation of a custody order issued by a state or federal court, to transport and keep the infant involved in the order without the limits of the state for a period in excess of 72 hours.

The arrest warrant for the Clarks was filed with the Sheriff's Office of Columbus County and, in turn, was transmitted in the customary manner by it to the Sheriff's Office in Mecklenburg County (North Carolina), the county of the residence of the Clarks, for service. The warrant was received in regular course, "by the luck of the draw" by the defendant Combs, a deputy who was on duty in the Sheriff's Office at the time. On March 5, 1984, Mr. Daly, counsel for the Clarks learned of the outstanding arrest warrant and called the Mecklenburg Sheriff's Office; he talked to Combs. He asked that Arthur Clark be allowed to appear on March 7 at the office of the Magistrate in Charlotte to respond to the arrest warrant. Combs agreed to this arrangement. Mr. Daly inquired whether at the time of his appearance Clark could make bond before the Mecklenburg magistrate. Combs replied: "When we first talked [on March 5], I told you he [Clark] could make bond here, the magistrate would set bond here in this county; if he would make it, he could get out, in that first conversation."

The next day [March 6] the Columbus County Sheriff's Department, at the instance of Judge Gore, transmitted over the North Carolina Police Information Network (PIN) addressed to the Mecklenburg County Sheriff's Department a message, advising whoever in the Mecklenburg Department was responsible for serving the warrant herein "that if Mr. Clark was picked up—to have him transported to Columbus County for sitting [sic] of the bond."[1] This message was duly referred to Combs, since he had the warrant for service. Combs took the message to his superior, Major Link, and, after recounting what he had earlier told Mr. Daly, asked Link what he should do. Link suggested, "Well, let's just let the magistrate worry about that and about setting the bond." He and Link decided to follow that course. The next day [March 7] Daly telephoned Combs requesting a delay of Clark's appearance until March 9 because of his [Clark's] illness. The request was granted. Daly then asked again whether Clark could make bond before the Mecklenburg magistrate. Combs, as summarized by him in his testimony and not disputed in the record, answered at this time: "I told you that [the setting of the bond] would be up to the magistrate, and I think when we talked, I told you that's the magistrate's decision, not mine."

Clark, accompanied by his attorney, presented himself at the magistrate's office on Friday, March 9, as agreed. The arrest warrant was served upon him by Combs. Combs then presented, without comment to the magistrate in the presence of Clark and his attorney, the PIN message the Sheriff's Office had received on Tuesday, March 6. Clark, by his attorney, requested the right to make bond then and there. The magistrate, after according Clark's counsel an opportunity to be heard, decided not to fix bond then and there but to transfer the proceedings back to the Columbus County judicial officer who had issued the arrest warrant for the fixing of bond. Clark's counsel promptly appealed the denial of the application to the presiding judge of the

---

1. Judge Gore testified without contradiction that no one suggested to him to send this message nor did he have any direct communication with anyone in the Mecklenburg Sheriff's Department.

Mecklenburg County Court, and the presiding judge of that court reviewed the magistrate's order and granted bond. Clark was released under this decision of the judge of the Mecklenburg Court within three hours after the hearing before the magistrate. Following various proceedings later in the prosecution of Clark under the Columbus County warrant, that prosecution was dismissed.

## II.

Immediately after the dismissal of the criminal prosecution, the Clarks filed the present section 1983 suit. The jurisdictional basis for such suit was frankly stated by Clark's counsel in the hearing in the district court:

But the nub of this case and *the reason we got in the Federal court was that Mr. Link and Mr. Combs, in participation with these other people, denied Mr. Clark his right to have bond set in Mecklenburg County* and that's enough to sustain jurisdiction here. (Italics added)

In their complaint, the plaintiffs were more expansive. They charged, with some extravagance of language, that all the defendants "acted in concert and conspiracy under the color of law to deprive Plaintiffs of these constitutional rights":

Mr. and Mrs. Britt sought Erica for some malevolent purpose inimical to Erica's welfare: either to obtain Erica's estate, or to assuage Mrs. Britt's guilt about the murder, or out of some other such dark secret of the heart. They so drew Judge Gore into complicity with their evil purpose and into hostility against the Clarks, by their *ex parte* communications, by their malicious innuendoes against the Clarks, and by the religious pressures they brought to bear upon him, that he acceded to their designs and became personally enmeshed in the controversy and departed from judicial neutrality, even to

the extent of repeatedly denying the Clarks due process of law and finally stepping outside his subject matter jurisdiction to seek to cause Mr. Clark to spend gratuitous time in the Columbus County jail.[2] Defendants Link and Combs and Stanley were willing participants in these deprivations of Plaintiffs Fourth and Fourteenth Amendment rights.

The Clarks named as defendants in this conspiracy suit the Britts, Stanley (the attorney for the Britts), and Link and Combs. They did not name Judge Gore a defendant "because," as the plaintiffs declare in their brief in this court, "of his possible judicial immunity." Nor was the Mecklenburg magistrate who refused to fix bond named a defendant presumably for the same reason but without the slightest evidence to support the charge, the plaintiffs in their brief in this court declared that "she (the magistrate) turned out to be a willing participant in the scheme and did not exercise the authority which the statutes mandatorily require that she exercise."

The defendants have filed various defenses. On this appeal we are only concerned with the defense asserted by Combs and Link. In their answer, these defendants denied any knowledge or participation in a conspiracy or "scheme" in the matters alleged and pled the defense of qualified immunity. These defenses were heard by the district court on the motion of Combs and Link for a summary judgment. The hearing was based by agreement on certain depositions. The district court dismissed the defenses on that record. Combs and Link challenge that dismissal which presents the issue on appeal.

## III.

We begin our inquiry by reviewing the decision of the district judge dismissing the plea of qualified immunity by the deputies.[3]

---

**2.** There is no evidence that Clark ever spent any time in "the Columbus County jail." Such limited custody of Clark as was had was on the Mecklenburg County premises.

**3.** The qualified immunity defense was heard on the record of the motion for summary judgment and not just on the allegations of the complaint. *See Turner v. Dammon,* 848 F.2d 440 (4th Cir. 1988):

The district judge summarized his ruling in these words:

> ... Judge Gore, through the Police Information Network, conspired with Deputies Link and Combs to abuse the North Carolina criminal process, to violate the North Carolina bail law, and to deprive Mr. Clark of his right under the 14th Amendment to due process of law.

Conceding that the United States Constitution and laws "do not specifically prohibit certain behavior by state officials" (apparently assuming that the deputies had not violated the Constitutional or statutory law of the United States), the Judge said, however, that behavior if it violates state law, can nonetheless be made the basis of a suit under section 1983. He proceeded to explain this application of section 1983 to state law violations:

> Section 1983 provides a remedy to plaintiffs who under color of state law are deprived of "any rights, privileges, or immunities secured by the Constitution and laws." There is no language in the statute which immunizes state officials who violate *state* law. Courts repeatedly have allowed § 1983 claims for behavior which, though not expressly prohibited in the text of the Constitution, is clearly inconsistent with the concept of due process of law.

Having found that a mere violation of state law will give rise to section 1983 action under some concept of due process, the district judge disposed of the motion of the deputies by holding that the deputies had violated the bail rights of Clark under North Carolina law and that "a reasonably competent public official would know of this law," and that a violation of that state law represented a due process violation. The district judge then held the defense of qualified immunity was not established in the summary judgment showing. It is from this decision that this appeal is taken.

Vindication of the right thus requires that the court of appeals not confine itself to the complaint. Rather, we must inquire "whether, when all the facts are viewed in the light most

## IV.

Since the issue in this appeal is the validity of the deputies' plea of qualified immunity, we consider first the principles governing qualified immunity. We take it as clearly established that under *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), a police officer such as Combs and Link sued under section 1983 may assert qualified immunity under the principles declared in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), which were specifically designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." The doctrine of qualified immunity, as declared in *Harlow v. Fitzgerald*, is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known," *Ibid.*, 818, 102 S.Ct. at 2738 or, as the Supreme Court phrased it in the recent case of *Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), that it protects the public employee performing discretionary duties "from civil damage liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," or, again, as set out in *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), such officers are "immune unless the law clearly proscribed the actions they took." The inquiry whether the duty of the public officer is clearly established "under the Constitution or laws of the United States" "generally turns on the 'objective legal reasonableness' of the action." *Creighton, supra,* 107 S.Ct. at 3038; *Malley v. Briggs, supra,* 475 U.S. at 341, 106 S.Ct. at 1096. And the burden of establishing that critical issue that the right violated was clearly established under the stated standard appears to rest on the

favorable to the plaintiff, there is a genuine issue, triable to a jury," of a clearly established constitutional violation. (citing cases)

plaintiff suing the public officer. This follows from the language of the Supreme Court in *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020–21, 82 L.Ed.2d 139 (1984):

> A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue. As appellee has made no such showing, the judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

 Moreover, the denial of the plea of qualified immunity is generally appealable even though there is no final judgment on the merits of the case. In *Mitchell v. Forsyth, supra,* 472 U.S. at 530, 105 S.Ct. at 2817, the Supreme Court said "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." 472 U.S. at 530, 105 S.Ct. at 2817. The rationale for this exception of the rule on "final judgment" is that the entitlement to qualified immunity accorded public officials is an immunity from suit rather than a mere defense to liability and like an absolute immunity, "it is effectively lost if a case is erroneously permitted to go to trial." 472 U.S. at 526, 105 S.Ct. at 2815. The issue of qualified immunity in this case includes a question of law and thus the district court's decision denying the plea is properly before us on this appeal. We accordingly turn to a consideration of whether the two deputies Combs and Link are entitled to qualified immunity here.

## V.

 The essential elements to be proved in any section 1983 action are (1) that the defendant was acting under color of state law in the actions complained of; and (2) that the defendant deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. *Briley v. State of California,* 564 F.2d 849, 853 (9th Cir.1977). If there is no violation of a federal right, there is no basis for a section 1983 action and no answer to a plea by the public officer of qualified immunity. A fundamental and fatal flaw in the decision of the district court denying qualified immunity in this case is its assumption that a section 1983 action may be based alone on a violation of state law or on a state tort. In *Street v. Surdyka,* 492 F.2d 368, 371 (4th Cir.1974), an oft-cited authority on this point, we began by quoting this language of the Supreme Court in *Screws v. United States,* 325 U.S. 91, 108, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945), addressing the application of the criminal counterpart of section 1983, *i.e.,* 18 U.S.C. § 242:

> But there is no warrant for treating the question in state law terms. The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under "color of any law."

On the basis of this construction of the statute, we firmly dismissed in *Surdyka* the contention that a section 1983 action might rest on a violation of state law saying that the police officer and two police cadets in that case were not liable for false arrest under section 1983 even if their arrest of the defendant violated state law. In so ruling we said:

> If Officer Surdyka violated this Maryland law, [holding a warrantless arrest for a misdemeanor improper] he may be liable to plaintiff in an action under the common law of false arrest or false imprisonment. But section 1983 does not provide a remedy for common law torts....
>
> ⋅ ⋅ ⋅ ⋅ ⋅
>
> Even if Officer Surdyka violated Maryland arrest law, he cannot be liable under section 1983 unless he also violated the federal constitutional law governing warrantless arrests.

492 F.2d at 370–71. This ruling in *Surdyka* was followed and applied by us in *Fisher v. Washington Metro. Area Transit Au-*

*thority,* 690 F.2d 1133, 1138 (4th Cir.1982), in which we said

> For this reason, a state law requirement expressed in unqualified terms that an arrested person is to be taken "immediately" before a committing magistrate may impose a more stringent standard than the constitutional one under the circumstances of the specific case. As with the original custodial arrest, such a requirement of state law cannot therefore be held to affect the general constitutional standard, [citing *Surdyka* ].

*Ibid.,* 1140–41.

And *Surdyka* and *Fisher* are in accord with decisions of the United States Supreme Court in other cases than *Screws.* Thus, in *Paul v. Davis,* 424 U.S. 693, 699–700, 96 S.Ct. 1155, 1159–1160, 47 L.Ed.2d 405 (1976), the Court reviewed a ruling "that the Due Process Clause of the Fourteenth Amendment and section 1983 make actionable many wrongs inflicted by government employees which had heretofore been thought to give rise only to state-law tort claims." In response to such contention, the Court responded firmly that such a ruling "would be contrary to pronouncements in our cases on more than one occasion with respect to the scope of § 1983 and of the Fourteenth Amendment." Recently in a death sentence case, Justice Rehnquist said:

> These varied assertions seem to suggest that the Florida Supreme Court failed to properly apply its own cases in upholding petitioner's death sentence. The obvious answer to this question, as indicated in the previous discussion, is that mere errors of state law are not the concern of this Court, [citing authority] unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.

*Barclay v. Florida,* 463 U.S. 939, 957–58, 103 S.Ct. 3418, 3428–29, 77 L.Ed.2d 1134 (1983). Further, in *Davis v. Scherer,* 468 U.S. 183, 193, 104 S.Ct. 3012, 3019, 82 L.Ed. 2d 139 (1984), *rehearing denied,* 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919, it was argued that "a defendant official's violation of a clear statute or regulation, although not itself the basis of [a section 1983] suit, should deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions." The Court refused to accept the argument that the violation of state law would in such a strained way foreclose a public officer from sustaining his qualified immunity plea.

Moreover, our cases of *Surdyka* and *Fisher,* applying Supreme Court precedents, have been repeatedly followed in other circuits. *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1349 (7th Cir.1985), is typical of these cases: ("... an alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution.") The district judge, in his opinion, however, cites and relies on a number of cases which he finds are to the contrary in which state torts were joined as pendent actions to a section 1983 action as indicating that a section 1983 claim may rest wholly on a violation of a state statute. Typical of these is *Raysor v. Port Authority of New York & New Jersey,* 768 F.2d 34 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337, which the district judge identifies simply as a suit for "malicious prosecution," a state tort. However, the two officer defendants in that case were charged with a warrantless arrest without good cause. A warrantless arrest without probable cause is a violation of the Fourth Amendment. *Jenkins v. Averett,* 424 F.2d 1228, 1231–32 (4th Cir.1970); *Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir.1987); *Duriso v. K–Mart No. 4195, Div. of S.S. Kresge Co.,* 559 F.2d 1274, 1277 (5th Cir. 1977); *Giordano v. Lee,* 434 F.2d 1227, 1230 (8th Cir.1970), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971); *Dennis v. Hein,* 413 F.Supp. 1137, 1139 (D.S.C.1976). It was that violation of a federal constitutional right and not the pendent claim of malicious prosecution under state law that supplied federal jurisdiction in that case. Similarly, in *Mattis v. Schnarr,* 502 F.2d 588 (8th Cir.1974), the section 1983 charge was the use of exces-

sive force in making a warrantless arrest without probable cause—again, a clear Fourth Amendment violation. *Justice v. Dennis,* 834 F.2d 380 (4th Cir. en banc 1987). The other cases cited by the district judge are similarly distinguishable and do not contradict the rule repeatedly stated by the Supreme Court and determined by us in *Surdyka* that a section 1983 claim can only be sustained by allegations and proof of a violation of the Constitution or statutes of the United States and specifically may not rest solely on a violation of state statutes or qualify as a common law tort.

From this review of the law, we would conclude, that the complaint in this action must identify a violation of the Constitution or laws of the United States and, absent such violation a plaintiff has no defense in the federal courts of qualified immunity.

## VI.

■ Looking to the allegations of the complaint and the record, it is manifest that the violations of law charged against the deputies, as stated by the appellees, were in the language of the appellees' brief merely violations of state law. This is crystal clear from the appellees' statement of their claim of violation of law in their brief, which is as follows:

Defendants Link and Comb conspired to effect the unlawful objective of denying Mr. Clark his rights under North Carolina law (a) to be presented to a Magistrate without unnecessary delay and (b) to have bail set by the Magistrate to whom he was presented.

It is manifest from this language that the only violation of law charged against the deputies is one of state law, not federal law. The plaintiff recognized this but sought to give their action a federal gloss by advancing the specious contention, repeatedly rejected by the Supreme Court, that a violation of state law will constitute a violation of substantive federal due process. As succinctly declared in *Gryger v. Burke,* 334 U.S. 728, 731, 68 S.Ct. 1256, 1257, 92 L.Ed. 1683 (1948), that argument

would convert every charge of a violation of state law into a due process action. The Court said:

We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.

Since the plaintiffs in this case do not charge and have offered no proof to sustain anything but an action for a violation of state law, they have not stated a section 1983 action.

It perhaps should be added that it is not at all certain that the acts alleged against the deputies, by their own terms, were even violations by the deputies of North Carolina criminal procedural laws. An arresting officer under North Carolina law does have the duty "for purpose of setting bail" to "take the person arrested before a judicial official without unnecessary delay." G.S. section 15A–501(2).[4] That is the full extent of the arresting officer's responsibility, so far as relevant to the issues in this case. It seems frivolous for Clark to contend that these officers did not present Clark after his arrest before a Magistrate "without unnecessary delay" in strict accordance with their responsibility under this North Carolina statute. It was at the request of Clark's counsel that the latter presented himself, accompanied by his counsel, before the Magistrate for arrest. Any delay in arrest was at the request of Clark's counsel. It was unquestionably not caused by anything the deputies did. And after the arrest warrant was served, there was no delay in presenting Clark before the magistrate. The other alleged violation committed by the deputies assumes that the deputies had a responsibility to require the Magistrate to whom Clark presented himself to fix bail then and there. This contention is wholly without merit. Deputy sheriffs may not conduct bail hearings nor may they decide on the granting or denying of bail under North Carolina law; that authority is vested in a judicial offi-

---

4. This duty is repeated in G.S. section 15A– 511(a)(1).

cer.[5] Neither of the grounds charged against the deputies thus allege violation by the deputies of any right of Clark under even state law, much less any federal constitutional or statutory provision.

The appellee, however, advances a unique argument. He argues that the deputies had agreed to "conceal" from Clark's counsel the PIN message and that, at the hearing, they produced the PIN message, gave it to the Magistrate, and thereby "corrupted" (the appellee's word) the Magistrate into wrongfully refusing to set bail and attempting to transfer the hearing to the County where the arrest warrant was issued. Under this reasoning, they would impute to the deputies the responsibility for the Magistrate's alleged error. We assume that by their argument the deputies should have disregarded the PIN message entirely or at least concealed it from the magistrate. It is true the deputies did not tell Clark's counsel of the PIN message. There was, though, no reason that they should; they were not obligated to do so under any North Carolina law. The PIN message was addressed to the Mecklenburg County Sheriff's Office. The message could possibly be read as a directive to the officer in that department who arrested Clark to bring Clark for his hearing to Columbus County. Combs had, as we have said, told Clark's counsel on the day before receiving the PIN message that Clark could present himself before the Mecklenburg County Magistrate for arrest and bail hearing. Naturally, he was perplexed about what he should do when he received the message. Should he call Judge Gore and tell him of the dilemma? Should he call Mr. Daly, Clark's counsel, and tell him of the PIN message? After

consulting his superior, Link, it was decided to communicate with neither Judge Gore nor Mr. Daly, appellee's counsel, but to leave to the Magistrate herself the question of whether the Charlotte Magistrate should respect Judge Gore's request or should proceed to set bail. We do not find the conclusion of the two deputies, to leave the question to the decision of the Magistrate in whom by law the responsibility in the matter was vested made them "corrupters" or "abusers" of "the [North Carolina] criminal processes"; it seems to us to have been a perfectly reasonable decision, to which proper exception may not be taken.

The deputies did, as the appellee states, give the PIN message to the Magistrate when the appellee made his application. They gave it without comment, so far as the record shows. Their action was in open court in the presence of both the appellee and his attorney.[6] Appellee's counsel was free to take such exception as he wished to the request of Judge Gore as set forth in the message. It is to be assumed that he argued that the Mecklenburg Magistrate was herself absolutely obligated under local North Carolina law to set bail for Clark and was forbidden to transfer the hearing to Columbus County as requested by Judge Gore. It may be suggested that, if he had known that fact a day or two earlier, appellee's counsel could have made a more persuasive argument in opposition to Judge Gore's request as set forth in the PIN message. Appellee's counsel is hardly in a position, however, to make such an argument. If the appellee's right to have bail set then and there by the Mecklenburg Magistrate was an absolute right so well established that any reasonably competent

---

5. Section 15A–511(a), (c) provides that it is the Magistrate who has the responsibility of granting or denying bail; in fact, section 15A–534(a) is even clearer—it provides that only "a judicial official" may determine the right to bail. A deputy sheriff is not a judicial officer and thus has no power or authority in the disposition of an application for bail. As we have said, if there was error in the failure of the initial magistrate to fix bail and in her transfer of such hearing to the Magistrate who had issued the warrant, the error was that of the Magistrate and not of the deputies.

6. We repeat: the action of the deputies was not the result of any prior conference, discussion, or agreement between them and the Magistrate. The deputies were completely indifferent whether the Magistrate gave any weight to such message in her determination of bail. They did not know either the Britts or the Clarks, the contestants in the custody hearing, and they had no interest in the controversy between them. All of this is undisputed in the record.

police officer would have known immediately, as appellee argues, then it would seem that a lawyer of the experience and competence of Mr. Daly would have sufficient knowledge of North Carolina procedure and would have been able to advance with equal vigor as in this Court, the North Carolina statutes which he thought controlling in the circumstances. In our opinion, the appellee suffered no prejudice simply because he and his counsel did not know of the PIN message until the hearing before the Magistrate. In any event, whether the message was to be accorded any weight whatsoever was a matter solely for the decision of the magistrate under state, not federal, law in the same way that the magistrate considered the argument of counsel. In no event can the action of the magistrate be viewed as the action of the deputies, who were without any power to fix or deny bail.

The appellee, though, seems to find something sinister or conspiratorial in the fact that Combs, when pressed at one point in his deposition by appellee's counsel, said that he thought the Magistrate would likely grant Judge Gore's request. The reasonable explanation for Combs' answer, however, is, in our judgment, simply the feeling that a deputy sheriff would have— that a magistrate would normally defer to his superior, a district judge. Nor was the assumption far-fetched in this case. Moreover, the arrest warrant was issued in Columbus County. It was not entirely unreasonable that the bail hearing should be held in the jurisdiction where the offense occurred and before the judicial officer issuing the warrant. Some state statutes expressly provide that the arrest "shall" be taken "before the court issuing the warrant." *See,* for instance, section 35–1–8–1(a), Indiana Code, as described in *Coleman v. Frantz,* 754 F.2d 719, 722 (7th Cir.1985). And the same semi-official North Carolina Manual for Magistrates,[7]

seems to contemplate the propriety of taking the arrestee before the magistrate who had issued the arrest warrant for the bail hearing. There was accordingly nothing bizarre or unusual in Combs' thinking that the Magistrate might require that the bail hearing be held in Columbus County in this case. Certainly, a federal violation cannot be fashioned out of the mere fact that Combs thought that the Magistrate might be inclined to give weight to a request from a district judge, pursuant to state, not federal, law.

In brief, the acts under state law of which the appellee complains are not something Combs or Link did but the action of the Magistrate in failing to fix bail. It was that action which caused the detention of the appellee for three hours until counsel could secure a reversal of the Magistrate's ruling and an order for bail. And if it be assumed that this action of the Magistrate was erroneous, the mere delay of three hours would not be a sufficient basis under any standard on which to found a federal constitutional violation against the magistrate or anyone participating in her action. The appellees' argument to the contrary that any detention, however short, is actionable under section 1983, is based on the decision of the Supreme Court in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), and by our own decision in *Pritchard v. Perry,* 508 F.2d 423 (4th Cir.1975). Both of those cases, however, involved warrantless arrests and detentions without probable cause prior to any arraignment or appearance. In such a case, there must be a judicial determination of probable cause as a prerequisite to any "extended restraint of liberty following arrest," under federal due process and the permissible limit of detention awaiting such a determination has been declared to be "brief." *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863,

---

7. This document, titled "Magistrates' Training Materials" (December, 1980), produced under the auspices of the North Carolina Institute of Government for Magistrates and written by Professor Farb and Benjamin Sender, states:

E. Initial appearance for arrests for outstanding warrants issued in another county.

1. Hold initial appearance even if paperwork not available (but check to be sure warrant is still outstanding).

2. Initial appearance could be held instead in other county if outstanding warrant is from nearby county and defendant could be taken there quickly.

43 L.Ed.2d 54 (1975); *Fisher v. Washington Metro Area Transit Authority, supra,* 690 F.2d at 1140. But the rule is different in an arrest under a facially valid arrest warrant which provides the probable cause finding as is the situation here. That distinction was at the heart of the decision in *Baker v. McCollan,* 443 U.S. 137, 143–44, 99 S.Ct. 2689, 2694–95, 61 L.Ed.2d 433 (1979). The distinction made in *Baker* between a case such as this where the arrest was made under a facially valid arrest warrant and a warrantless arrest made without probable cause has been noted and followed in, among other cases, *Coleman v. Frantz, supra,* 754 F.2d at 723 and *Harper v. McDonald,* 679 F.2d 955, 959 (D.C.Cir. 1982), both of which cited and followed *Baker,* and was tangentially touched on by us in *Fisher. See* 690 F.2d at 1138–41. The rule as to when a detention under a facially valid arrest warrant, is so great as to amount to a constitutional violation, was stated in *Baker* as follows:

> We may assume, *arguendo,* that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty ... without due process of law." But we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation.

In later explicating and applying that ruling, *Harper,* citing *Baker,* said:

> Absent an attack on the validity of the warrant under which he was arrested, respondent's complaint is simply that despite his protests of mistaken identity, he was detained in ... jail.... Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution. Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment.

679 F.2d at 959. If three days are not sufficient under those circumstances to support a due process violation, a mere three hours' delay such as here will not qualify.

■ Finally, we conclude that there were no violations of any federal constitutional rights of the appellee Clark by Combs and Link and specially that the detention sustained by him as a result of the Magistrate's decision made under a facially valid arrest warrant was not such as to support a section 1983 claim even if Combs and Link can in some way be said to have responsibility for the Magistrate's decision not apparent to us. The decision of the Magistrate, resulting in a detention of but three hours is insufficient to sustain a section 1983 claim, and this would apply to anyone charged jointly with the Magistrate for responsibility in that action. It follows that it cannot be said that the deputies had, while acting under color of their office, inflicted any violation of Clark's federal constitutional or statutory rights. Under those circumstances, the deputies were entitled to qualified immunity and the district court should have dismissed the action against them.

## CONCLUSION

We accordingly remand the action to the district court with instructions to dismiss the action of the plaintiffs against the defendants Combs and Link, with costs in favor of the defendants.

**REVERSED AND REMANDED.**